THE VILLAGE OF RUTLAND *v.* JACOB EDGERTON.

*Water Rights in the Village of Rutland. Acts of* 1858, *No.* 76.

An incorporated aqueduct company which supplied its several members, who were called post-holders, with water through posts at their residences, conveyed by indenture its aqueduct to the plaintiff, an incorporated village, but provided that the several proprietors of posts in said aqueduct, should at all times be entitled to draw water therefrom, " in such quantities, and upon the payment annually or semi-annually of such sum by each, as shall be determined by a joint committee of six," to be appointed in equal numbers by the parties to the indenture. Said committee

Village of Rutland *v.* Edgerton.

were appointed, and fixed rates, and resolved that if the rates established by the plaintiff's water commissioners should be thereafter changed, the rates fixed by them should be changed in the same ratio ; and also resolved, that said post-holders should be entitled to draw water by gauge or stop-cock, at their option ; but if by gauge, that the same should be under the control of said commissioners. *Held*, tha said committee did not, by their resolutions, delegate or attempt to delegate their authority to said water commissioners.

The rates established by said committee were, that families holding posts in said aqueduct, not exceeding five in number, should be entitled to water at the rate of five dollars a year, payable in advance ; families with more than five persons and not exceeding seven, six dollars; families with more than seven persons, seven dollars; for each horse and cow, fifty cents. At the time said rates were fixed, water-closets cleansed with water, were not in use in the vicinity, and did not come into use till some time thereafter, when the defendant, who was a post-holder, put one into his house, and drew water by means of a stop-cock, but used no more than when he drew by a gauge. *Held*, that the use of the water for said water-closet was a new use, not provided for by the rates established by said committee, except by the application of the rule by them provided for changing said rates.

*Held*, also, that the defendant was liable in an action founded on § 4, No. 76, of the Acts of 1858, for using the water for said water-closet, without permission of said water commissioners, or paying or tendering extra rent therefor.

TRESPASS on the case for using water from the plaintiff's aqueduct, without permission of the plaintiff's water commissioners, brought upon § 4, No. 76, of the Acts of 1858, entitled, "An act in addition to an act incorporating the village of Rutland." *
Plea, the general issue, and trial by the court, March term, 1873, Rutland county, WHEELER, J., presiding.

Many years ago a corporation was formed for the purpose of supplying the corporators with water in the village of East Rutland, which was the same village which now constitutes the plain-

---

* Whereby it is enacted:

" SEC. 1.   The village of Rutland, in addition to the officers it is now authorized to appoint, may appoint three water commissioners, each one to hold his office for the term of three years from the first day of July next after his election.

    *     *     *     *     *     *     *     *     *     *     *

" SEC. 3.   The water commissioners which have been or may be appointed by said village, two of whom shall constitute a quorum for transacting business, shall have the control and management of the aqueduct laid by said village; may, from time to time, grant permits for the water from said aqueduct, and upon such terms and conditions, and for such compensation or rent, as they shall, from time to time, establish and prescribe, subject to such rules and regulations as may be established by said village.

" SEC. 4.   If any person shall use any of the water from said aqueduct without the permission of said commissioners, an action of trespass on the case may be maintained by said village against him for the recovery of damages therefor, with full costs."

tiff corporation; and that corporation brought water in an aque-duct to that village, and conveyed it in logs to the houses of the several corporators, who received the water there through posts connected with the logs and aqueduct, for the accommodation and use of themselves and families. The aqueduct, logs, posts, and water, were under the control of the officers of the aqueduct cor-poration; and means for paying the expenses were obtained by assessments upon the corporators using water from posts, who were called in their records and proceedings, post-holders. In 1852, the plaintiff corporation was authorized by the legisla-ture to acquire the rights of said water corporation; and in 1857 an arrangement was made between the two corporations for a transfer of the aqueduct of said water corporation to the plaintiff, and on the 26th of August in that year a contract and conveyance for that purpose was made and executed between said corporations, whereby it was covenanted:

" That the party of the first part [said post-holders], in con-sideration of the covenants, agreements, and conditions herein-after stipulated and contained on the part of the party of the second, have demised, leased, and to farm-let to the party of the second part, all the aqueduct now owned and enjoyed by the party of the first part, with all the privileges, rights of way and entry upon lands of individuals for the purpose of repairing, relaying, and maintaining said aqueduct, and the right of taking water by means of said aqueduct, that now appertain and belong to said party of the first part, for and during the term of one thousand years." *Habendum*, " to use, occupy, and enjoy for the purpose of supplying the inhabitants of the village of Rutland and vicinity with water, in such manner and upon such reasonable terms and con-ditions as shall be prescribed by the said party of the second part."

And whereby the plaintiff covenanted to relay the main branch of said aqueduct in certain portions of the village, within one year, with suitable provision for taking water therefrom to the several posts used by the party of the first part. And whereby it was further covenanted as follows:

" The said party of the second part further covenants and agrees with the party of the first part, that the several proprietors of posts in the aqueduct now owned by the party of the first part, shall at all times be entitled to draw water from said new aque-

duct in such quantities, and upon the payment annually or semi-annually of such sum by each, as shall be determined by a joint committee of six, three of which committee to be appointed by the party of the first part, and three by the party of the second part.

"It is mutually covenanted and agreed between the parties, that the party of the second part, except as above stipulated, shall have the sole control of the distribution and disposition of the water conveyed in said aqueduct, and may receive and collect all sums for the use or rent of said water, and may require of those who use the water payment thereof in advance."

The committee provided for in said contract, were duly appointed in July, 1858; and in August of that year, acted upon the business of their appointment, and reported to the parties interested, six resolutions, as follows:

"*Resolved*, That families holding posts in the aqueduct not exceeding five persons, shall be entitled to water at the rate of five dollars a year, payable in advance; families with more than five persons, and not exceeding seven, six dollars; families with more than seven persons, seven dollars; and for every horse and cow, fifty cents each.   *   *   *

"*Resolved*, That we recommend to the water commissioners to equalize, as far as possible, the expense of delivering the water to the proprietors of the old aqueduct company.

"*Resolved*, That if the rates established by the boards of water commissioners for supplying others besides proprietors of the old aqueduct company, shall at any subsequent time be altered, then and in that case the rates here established by us shall be raised or lowered in the same ratio; provided, that in no case shall the proprietors of the old aqueduct company be required to pay any more than others using the water, and the rates fixed by us as above stated, shall not be altered before the twentieth day of June, 1859.

"*Resolved*, That the proprietors of the old aqueduct shall be entitled to receive the water from the village corporation, by a guage or stop-cock, at their option—the guage to be regulated and controlled by the water commissioners.

*     *     *     *     *     *     *     *

"*Resolved*, That the owners of posts under the old aqueduct company, shall be subject to all the rules, regulations, and directions of the water commissioners not inconsistent with the foregoing resolutions, the same as others who take the water."

This report was recorded in the records of the old aqueduct company, next after the record of said contract.

At that time there was a post of said aqueduct company at the house since occupied by the defendant, which had been there many years for the use of the occupants in obtaining water, and Charles L. Williams then owned and occupied it, and drew water from the post for the use of himself and family, and he was a corporator and an officer of the water corporation. There were then no water-closets which were cleansed by drawing water, in use by any of the post-holders or their families, nor by the inhabitants of the village. Williams continued to occupy the house mentioned, and to use the water from the post there, until he gave up the occupation to the defendant; and on November 3d, 1859, while the water was so in use, and after the plaintiff took control of the aqueduct under said conveyance, Williams conveyed the house, with the premises attached and the appurtenances, to the defendant, who has since occupied the same, and used water from the post. The plaintiff relaid the aqueduct, as provided in the contract, and took control of it, and the water commissioners established rates for the taking of water by other persons, which were the same as those fixed by the joint committee for post-holders; and the water commissioners annually granted permits to persons, post-holders and others, to use the water, upon payment of the rates annually in advance—the year for that purpose commencing on the 20th of June. The defendant, after his purchase of Williams, claimed to be, acted, and was recognized by the aqueduct corporation as, a corporator and post-holder, and he sometimes held office in that corporation.

The defendant drew water from his post for several years after his purchase, by a gauge, and paid the water-rates fixed by the joint committee, to the water commissioners. Before the 20th of June, 1864, families in the village began to use water-closets drawing water, and the water commissioners fixed a rate for such water-closets at five dollars a year. Some post-holders, before 1871, commenced using such water-closets, and paid the rate fixed for such use. The rate for horses was raised by the water commissioners, before June 20th, 1871, to one dollar and fifty cents a

year. The defendant, in the fall of 1870, put a water-closet drawing water from the aqueduct, into his house, and commenced using it, and continued to use it to some extent in cases of sickness. He commenced taking water by a stop-cock instead of a gauge, before June 20th, 1871, and after that, with the use of the water-closet, he used no more water than he had been accustomed to draw with the gauge. Before that day the water commissioners fixed water rates for all the inhabitants of the village, among which were rates for the defendant the same as for others ; for his family, which was less than five persons, five dollars ; for a horse which he kept, one dollar and fifty cents ; and for the water-closet he had put in and commenced to use, five dollars ; and on that day, which was the regular day for granting permits, claimed those sums of him. The defendant then claimed that they had no right · to demand of him the rate fixed for a water-closet, and took out more than money enough to pay the rates for his family and horse, and offered to pay for those. They claimed the right to the whole, and refused to receive any unless he would pay the whole. He used the water from the aqueduct from the 20th of June, 1871, to the 20th of June, 1872, without any permission from the water commissioners, but with their knowledge. They did not shut it off, nor forbid his using it, and he continued to draw it as he had been drawing since he made the change mentioned. The aqueduct corporation had no meeting between January 18th, 1864, and August 12th, 1872, but did not lose its corporate existence. There was no evidence of actual damages to the plaintiff by this use of water, other than the evidence of the facts stated. The plaintiff claimed to recover the amount of water rates fixed against the defendant for that year. The court, in order that the rights of the parties might be established by the supreme court, rendered judgment, *pro forma,* for the defendant ; to which the plaintiff excepted.

*Dunton & Veazey* and *Edgerton & Nicholson,* for the plaintiff.

The joint committee appointed by the aqueduct company and the village, agreed that, " if the rates established by the board of

water commissioners for supplying others besides proprietors of the old aqueduct company, should, at any subsequent time, be altered, then and in that case the rates established by them should be raised and lowered in the same ratio." This action of the committee is binding upon the members of the old aqueduct company. The defendant virtually concedes this by offering to pay $1.50 for water for his horse, it being the rate fixed by the water commissioners, when the rate fixed by the joint committee was only fifty cents. The committee do not attempt to delegate their authority to the water commissioners. They provide that the rates *fixed by them shall be raised or lowered*, so that the rates shall be the same for the proprietors of the old aqueduct as for others. The action of the committee has been ratified by the old aqueduct company. The case shows, as well as the records, that the report of this committee is recorded next to said conveyance in the records of the aqueduct company. This is evidence that the company had knowledge of the action of the committee ; and nothing appearing to the contrary, their assent thereto is to be presumed. *Miller et al.* v. *R. & W. R. R. Co.* 36 Vt. 452, 475 ; *Curtis et al.* v. *Leavitt*, 15 N. Y. 47, 49. The case also shows that the water rates have been changed from time to time by the water commissioners, and that the old aqueduct company, except the defendant, have acquiesced therein. The water commissioners, by act of the legislature, are given the control of said aqueduct, and the authority to fix the water rates. Acts of 1858, No. 76. If there is any doubt about the legality of the action of said committee, this act of the legislature legalizes it.

The defendant drew water by gauge for several years, and then changed to a stop-cock. The fact that he so changed, did not give him the right to draw water for any other purpose than before. He had no right to the use of water for his water closet ; but the water commissioners had the right to sell it to him and to fix the price. It is not a sufficient answer to this for the defendant to say that he uses no more water than used to run through his gauge. The water commissioners had the control of the gauge, and it was their duty to see that none of the water was

wasted. Their failure to do their duty in this respect, would not give the defendant the right to claim that more water should run through his gauge than was required for the ordinary use of his family and domestic animals. The case shows that the defendant used the water for one year, without the permission of the water commissioners. He is, therefore, liable in this action under § 4, No. 76, of the Acts of 1858.

The conveyance from the old aqueduct company to the village of Rutland, gives the latter the absolute title to said aqueduct, subject only to the condition that it was relaid in one year. The obligation to furnish the old post-holders with water, is an independant covenant, the breach of which would not affect the title to the aqueduct. This covenant does not give the defendant the right to use the water without obtaining the permission of the water commissioners. If the water commissioners should unlawfully refuse permission, the village would be liable on said covenant.

*Prout, Simons & Walker* and *W. H. Smith*, for the defendant.

The aqueduct company is a subsisting corporation, and must so continue, to secure to it and the post-holders the rights reserved in the conveyance to the village.

The rights of the post-holders to their supply of water from the aqueduct, for all time, were attempted to be secured and protected in said conveyance. The conveyance is substantially upon condition that the members of the aqueduct company shall be at all times supplied with water, &c.—a reservation of this right, and on failure, the lease to become void.

It will be seen that the aqueduct company do not part with its right to a voice in this matter, but submit to a joint committee, one-half to be of its own members; and there the power controlling the "distribution and disposition of the water," rests, and must remain forever. Such committee shall determine the "quantity" the post-holders may draw "at all times." The committee had no authority to yield or transfer its powers in this matter to the village, or its water commissioners. Theirs is a delegated authority, not transferable, except under special powers of substitu-

tion.   2 Kent Com. 633 ;  *White* v. *Fuller*, 38 Vt. 193, 208 ; 9 Vesey, 234, 251.  The legislature cannot aid in divesting the owner of his property and rights.  It might as well take all, as the part reserved in the indenture.

The committee settled the basis and fixed the rates for the post-holders to receive water.  They leave nothing for the village or the water commissioners, within the scope of their power to determine.  This committee undertook to provide for future change in the rates to the post-holders—for their rates to be more or less, in the same ratio as others.  Their third resolution relates exclusively to rates and ratios, not to specific uses or purposes to which the original proprietors might appropriate the water.  The basis was settled by them, and determined for families at rates they fixed, and subject to increase or diminution by ratios.

The defendant was not dependent upon the volition of the water commissioners, or their permit, for water from the aqueduct for his family.  This right he has perfect and complete under the conveyance to the village and the report of said committee.

The case discloses no proper foundation for this action.  Considered as a claim for *damages* as such, none are shown, and the case so finds.  The *quantity* of water used can alone be the ground of claim for *damages*, and here the case finds that defendant used no more water than he took through his gauge, and no more than he was entitled to by stop-cock—no more than he drew before his water-closet was provided, and the closet was never used only " occasionally in case of sickness."  And besides, it does not appear that the water-closet was used at all during the period from June 1871 to June 1872.  But again, if the rule, compensation merely for the quantity that has been taken irrespective of motive and intent, is to be adopted, still the amount should be arrived at in view of the measure of defendant's right ; and it is not to be entirely governed by such a use and appropriation of the water as the case shows.  Here was no tortious act of the defendant.  He wanted the water for his family.  He was entitled to it.  He tendered his money to pay for it.

Considered as a claim for compensation, or for " the amount of water-rates fixed by the commissioners for that year," the form

of action is inappropriate. It is upon a statute, and not upon a contract liability ; for a liability in the nature of a tort, in which an evil intent or a bad motive is an element. In short, it is an action for wrongfully using the water without permission, express or implied, and without right, and against the will of the proper authorities. Upon the facts disclosed, the only action to which the defendant can be subjected is an action of assumpsit.

The case shows, and we insist, that the defendant did not use the water from the aqueduct without the permission of the water commissioners. They so allowed its use, so knew of its use, and did not forbid the defendant using it and allowing it to run into his house, that it cannot be said in the sense of the statute, that its use " was without the permission of the water commissioners." Nothing was done by the commissioners to prevent such use.

The plaintiff now brings this action, only claiming to recover the fixed rates for the year—a rule of liability arising in assumpsit, and as upon a waiver of the tortious act of defendant in the supposed wrongful appropriation of the water. The action can be maintained upon no such principle ; and the only way of avoiding the difficulty and its effects is, to say and hold that the plaintiff can in this action recover a compensation for what has been actually taken, and that must appear to have been done without right. *Merrick* v. *Plumley*, 99 Mass. 566 ; *Townson* v. *Green*, 2 C. & P. 110. Again—if the defendant had taken the water under a permit, and had the declaration counted upon a promise to pay, the case might merit a very different consideration. The defendant has made no such waiver of his rights and claims.

The opinion of the court was delivered by

Ross, J.   August 26, 1857, the proprietors and owners of the aqueduct in East Rutland, by indenture, conveyed to the plaintiff their aqueduct, with all their rights and privileges in taking and conveying the water to their several places of abode, on certain specified conditions and covenants. It is necessary to consider only two of these covenants, in the determination of the questions arising in this case. In the first, it is covenanted that " the several proprietors of posts in the aqueduct, shall at all times be entitled to

draw water from the new aqueduct," which the village of Rutland covenanted to lay within one year thereafter, " in such quantities, and upon the payment, annually or semi-annually, of such sum by each, as shall be determined by a joint committee of six," which was to be appointed in equal numbers by the parties to the indenture. By this covenant the proprietors of the aqueduct secured to themselves the right to be first supplied with water from the relaid aqueduct, upon the payment of the rent which should be determined by the joint committee. If at any time there should not be sufficient water to supply all the inhabitants of the village, the village could not withdraw the water from the proprietors of posts in the old aqueduct, to enable it to supply itself or the inhabitants of the village other than post-holders. Immediately following this is the further covenant, " that the party of the second part [the plaintiff], except as above stipulated, shall have the sole control of the distribution and disposition of the water conveyed in said aqueduct, and may receive and collect all sums for the use or rent of said water, and may require of those who use the water, payment thereof in advance." These two covenants, construed together, give the entire control and management of the aqueduct to the plaintiff, subject to the right secured to the post-holders in the old aqueduct, to be first supplied with such quantities of the water, and upon the payment of such rent, as the joint committee should determine. The plaintiff is a corporation, and can act only through its agents. Hence these covenants, subject to the limitations named, gave the control of the distribution and disposition of the water, and the collection of the rents, unto such of the agents of the plaintiff as it should appoint, or be empowered to appoint, for that purpose. The joint committee contemplated by these covenants, was duly appointed in July, 1858, and in August of that year, acted upon the matter submitted, and reported to the parties their action, in six resolutions. Their report was so far accepted, as to be acquiesced in by both parties, and thereupon became binding upon both. By the first resolution, the committee fix the quantity of water which each post-holder shall be entitled to draw, and the rent to be paid for such quantity. The quantity is determined by the number of

persons composing the family of each post-holder ; and the rent is varied with the number of persons in each post-holder's family. The committee did not in terms express the uses for which the family should be supplied with water, but did provide that if the water was used for a horse or cow by any of the post-holders, such post-holders should pay an additional sum. From this and the other provisions of the resolution, it is apparent the committee intended that each post-holder should be supplied with a quantity of water sufficient to answer all the then uses to which the water was put by such families,—a quantity sufficient for all their then domestic purposes. No restriction is put upon the post-holders in respect to the manner in which the water was to be applied to those uses. No doubt the quantity supplied to different familes constituted of the same number of persons, would vary somewhat under this resolution. Some such families would use more water for the same purpose than others ; and might also use it for some purposes which others did not. Notwithstanding such slight inequalities in the quantity to be supplied to such families under this resolution, the committee adopted it as approximating as nearly as was practicable to furnishing an equal quantity to each post-holder whose family consisted of the same number of persons. No provision was made, or attempted to be made, in this resolution, for the quantity of water, or the rent to be paid, for new uses to which the post-holders might thereafter desire to put such water. The third resolution provides, that the post-holders might receive this quantity of water by gauge or stop-cock, at their option ; but in case it was received by gauge, the gauge was to be regulated and controlled by the water commissioners. In every resolution but one, the water commissioners are recognized as the board or agents of the plaintiff, who were to have the control and management of the aqueduct, regulate the distribution of the water, fix the rates to be paid by all except old post-holders, and to collect the rents. The last resolution provides that the owners of posts under the old aqueduct company, shall be subject to all the rules, regulations, and directions of the water commissioners, not inconsistent with the resolutions. In order to make the rule established by the first resolution in regard to the quantity of water to be drawn

by the owners of posts, and the rent to be paid by them, somewhat flexible, so it would be adapted to new uses that might arise, and meet the varying wants and necessities of all who should be sup-plied with water from said aqueduct, the second resolution pro-vides, that the rates established by the first resolution shall, after June 20, 1859, rise or fall in the same ratio as the rates estab-lished by the water commissioners for non-post-holders should be raised or lowered, but never so as to exceed the rates charged to non-post-holding recipients of the water. By these two resolu-tions, the joint committee fix the rates of rent to be charged to those holding posts in the old aqueduct, and the basis, or rule, by which those rates may be varied from time to time. It is objected on the behalf of the defendant, who is a post-holder, that by the second resolution the joint committee undertake to delegate the power to fix the rates to post-holders, to the water commissioners. But we do not so regard it. In that resolution the joint com-mittee establish for themselves and the post-holders, a basis by which the ratio for varying the rates named in the first resolution is determined. When this ratio is applied to the rates in the first resolution, it gives the rates to be charged to the post-holders as established by the joint committee, and not as established by the water commissioners. The water commissioners cannot establish, arbitrarily, the rates to be charged to the post-holders. They can only charge them the rates established by the joint committee, as found by applying the committee's rule in regard to the raising or lowering the rates named in the first resolution, to the rates estab-lished by the committee for that year. We think it was com-petent for the joint committee to establish a rule for varying the rates named in the first resolution, and that the second resolu-tion is not a delegation of the power conferred on the joint com-mittee to the water commissioners. By applying this rule to the rates established in the first resolution, to the rates to be charged to the post-holders who desire to use the water for the new use of cleansing a modern water-closet, it operates to raise those rates $5.00 per year for such families. It is objected by the defendant, that the use of water for the last-named pur-pose, is for family purposes, and included in the rates established

in the first resolution.   The case finds that at the time those rates
were established, no such use of the water was made, or con-
templated to be made, by any of the post-holders or others draw-
ing water from the aqueduct.   We think that this is a new use of
the water, which is not provided for by the rates named in the
first resolution, except by the application of the rule established
in the second resolution.   This we think is clearly so, when the
post-holder elects, as the defendant has done, to draw the water
he uses by means of a stop-cock.   He must confine the water thus
drawn, to such family uses as the water was ordinarily put when
the rates were established, if he would not subject himself to the
application of the rule established in the second resolution.   If he
received his water through a gauge, it may be that the plaintiff
would have no right to inquire in regard to the use to which he
put the water after it issued from the gauge.   But that is not this
case.   The defendant, to enable him to put the water to this new
use, draws it by means of a stop-cock, and if he does so for this
use, which has arisen since the rates named in the first resolution
were established, he must submit to the payment of such additions
to those rates as are made by the application thereto of the rule
laid down in the second resolution.   This view of the case renders
it unnecessary to consider whether in a proper case, a new joint
committee could be created by the parties to the indenture, to de-
termine the rights and liabilities of the old post-holders ; and no
opinion is expressed in regard thereto.   It also renders the fact
found by the court, that the defendant drew no more water
through the stop-cock during the year ending June 20, 1872, than
was delivered to him during the previous years when he received
the water through a gauge—immaterial.   On the facts found by
the court below, these views give the plaintiff the right to demand
of the defendant the amount claimed by it for the use of the
water for the year ending June 20, 1872.

II.   It is further claimed by the defendant, that if liable at all
on the facts found, he is not liable to this action, founded on the
act of 1858.   The act of 1858, appears to have been passed to
enable the plaintiff to elect water commissioners, *eo nomine*, to
define their duties, and to provide a remedy for damages sustained

from persons using the water without conforming to the regulations of the water commissioners, and paying for the use of the water in advance. As we have seen, the indenture confers upon the plaintiff the right to make rules and regulations in regard to the use of the water, and to demand and receive the lawful rent therefor in advance. Hence the rule requiring the defendant to pay in advance, was not repugnant to the indenture. We think it is quite evident, that the section of the statute on which this suit was brought, was intended to furnish a remedy for the recovery of the damages the plaintiff might sustain by reason of any person (post-holder or otherwise) taking and using the water without right, in other words, without having put himself in the position to demand from the water commissioners a permit to use the water, by tendering the rent which the plaintiff had the right to exact. When the act says if any person shall use the water without the permission of the water commissioners, he shall be liable to the action named, it evidently has reference to a person who should use the water without the right to demand such a " permit " as the water commissioners are authorized in the preceding section to grant. The sums which the plaintiff would have the right to receive from most persons by the way of rent, would necessarily be small ; and unless it could recover full costs against one who should take and use the water without right, it might as well not attempt to enforce their collection by suit. Hence the necessity of some such remedy. The right of the legislature to pass the act and grant the remedy is unquestioned. The case finds that the defendant refused to pay for the year ending June 20, 1872, the amount which we hold the water commissioners rightly demanded from him, and that he continued to use the water without obtaining from them a permit, or tendering them a sufficient sum of money to entitle him to a permit. On these facts, notwithstanding the water commissioners did not forbid him to use the water, nor cut him off from drawing the water for the purposes he desired to use it, he was using it without permission, within the meaning of that word as used in the act, and subjected himself to this action. The *pro forma* judgment of the county court

22

is reversed, and judgment rendered for the plaintiff to recover eleven dollars and fifty cents, with interest since June 20, 1871, and costs.